AMOS CLARK v. THE CITY OF ELIZABETH ET AL.

1. Proceedings in *mandamus* are largely within the discretion and control of the court. The court may decline to hear the application for a writ unless in the alternative form, and the power of the court on a rule to show cause and after the decision to direct an issue by proper pleadings to provide for review by writ of error, is unquestionable.

2. The act of 1874 (*Pamph. L., p.* 45; *Gen. Stat., p.* 2689), which authorizes cities to enter into contracts with railroad companies to change the location of or elevate their railroads within the city as might be necessary, and authorizes cities to vacate, alter the lines and change the grade of any streets or highways therein, and to do all such acts as may be necessary and proper to effectually carry out such contracts, does not supersede the provisions of the city charter which provide for the manner in which the city authorities should legislate with respect to the change of grade.

3. Contracts such as are provided for by this statute, as well as the changes in grade, are municipal acts, to be done not by any officials who might come under the designation of city authorities, but by the common council exercising its powers in the manner in which that body by the city charter was authorized to perform its functions.

4. The city of Elizabeth made a contract with a railroad company for the elevation of its tracks over certain streets, all costs and expenses for making such change to be paid by the company, and the city covenanted that it would take all proceedings necessary to authorize changes in grade or vacation of streets for the construction of under-

61 565
64 493
64 495
64 496
64 593
61 565
62o 610
62o 614
62o 615
61 565
69 129

grade street crossings, and that all proceedings necessary to be taken to authorize changes in grade or vacation of streets, or the construction of undergrade crossings, or the acquisition of lands required to carry out the purposes of the contract, should be taken and completed by the city, and that all legal liability, if any, for damages to persons or corporations other than the railroad company, for changes of grade and vacation of streets and undergrade crossings, should be assumed and paid by the city. An ordinance was passed by the common council changing and establishing the grades of parts of certain streets to carry into effect the said contract. *Held—*

1. That the contract with the company did not operate *ex proprio vigore* to effect such changes in the streets, and that a city ordinance was necessary to effectuate that purpose.

2. The averment in the return that the ordinance was passed for the purpose of expressing the city's consent to a plan formulated by the railroad companies for abolishing grade crossings, and was not intended to assume or incur liability by the city, is not relevant to this issue. As between the relator, whose property was injured by the change of grade, and the city, the ordinance is to be construed according to its legal effect and not in conformity with purposes and intentions other than such as are deduced from the ordinance itself.

3. That inasmuch as the act of 1889 (*Pamph. L., p.* 378) provided that damages for changes of street grades should be assessed on lands benefited by the change, such ordinance was not an ordinance involving the expenditure of public money, within the provisions of the city charter, requiring a three-fourths vote to pass.

4. That after an ordinance, passed for a lawful purpose, has accomplished its object, the city cannot attack it collaterally for irregularity in the mode of its enactment.

5. The act of 1862 (*Gen. Stat., p.* 2824) authorizing railroad companies in crossing public highways to alter the location of such highways at their own expense, so far as necessary to make them pass over or under the tracks, and a charter provision making it the duty of the railroad company to keep in repair passages and bridges over and under its tracks where a public road crosses the same, do not authorize the company to injure private property in altering the grade of a street or highway without compensation made therefor.

6. The act of 1889 (*Pamph. L., p.* 378) provides that in making changes of street grades, *it shall be lawful* for the municipal authorities to make proper award for damages to the owner or owners of any house or building erected upon any street the location whereof is changed, and that the damages to be paid to such owner shall be assessed upon and paid by the lands and real estate benefited thereby in proportion to the benefits received. *Held—*

1. That this act, by force of its enacting words and repealer of inconsistent acts, was made applicable to the city of Elizabeth.

2. That the power granted to the city authorities to assess damages and benefits as a means of compensating owners of lands for injuries arising from changes in the grade of streets, created a duty on the part of the city authorities in respect thereof, the power having been granted for the benefit of persons injured by such public improvements.

7. Where, in conferring powers upon public officers, the language in which the authority is conferred is directory, permissive or enabling, as where the words "may," or "is empowered," or "it shall be lawful," are used, such expressions have a compulsory force unless there be special grounds for a different construction.

8. The rule is quite universal that where a power is given to public officers, the language used, though permissive in form, is, in fact, peremptory whenever the public interest or individual rights call for its exercise.

[*Argued November 19th,* 1898; *decided June 20th,* 1898.]

On error to the Supreme Court. On writ of alternative *mandamus* and return thereto, and demurrer to the return.

For the plaintiff in error, *George T. Parrott* and *Richard V. Lindabury.*

For the defendants in error, *C. Addison Swift* and *Frank Bergen.*

The opinion of the court was delivered by

DEPUE, J. This case was argued in the Supreme Court on a rule to show cause why a *mandamus* should not issue, and after argument on the rule and decision in the Supreme Court, the pleadings were moulded under the direction of the court, in pursuance of a stipulation in writing made by counsel. The stipulation of counsel was that, upon the decision of the rule to show cause, the pleadings should be so moulded under the direction of the court as to give either party a right to a writ of error. The proceedings were thereupon amended and made to consist of an alternative writ of *mandamus,* a return thereto, a demurrer to such return, and a joinder in demurrer, and a judgment final against the relator on the demurrer, as will appear by the certificate of the Supreme Court annexed to the rule.

The proceedings in *mandamus* are largely within the discretion and control of the court. The court may decline to hear the application for a writ unless in the alternative form, and the power of the court on the hearing of a rule to show cause and, after the decision, to direct an issue by proper pleadings to provide for a review by writ of error, is unquestionable. Appropriate pleadings having been filed under the direction of the court and judgment entered, the pleadings and judgment thereon constitute the record on which the writ of error is heard. The record returned with this writ consists of an alternative writ of *mandamus*, the return of the defendants, the demurrer to the return and judgment on such demurrer in favor of the defendants.

The defendants insist at the outset that the case in the Supreme Court turned on a question of fact, and therefore its decision cannot be reviewed on error. If there be in the return which was demurred to any fact substantially at issue, the judgment of the Supreme Court should, for that reason, be sustained, the demurrer being improperly filed. An inspection of the record in this court, on which we are required to adjudicate, does not disclose any question of fact at issue between these parties, and it cannot be conceived that the Supreme Court, in directing this issue, would have approved of pleadings framed as these are, to present questions of law, which alone can be considered on demurrer, if, in the judgment of the Supreme Court, questions 'of fact proper to be considered by a jury appeared in the case. The opinion of the Supreme Court, which appears in the record, indicates a decision against the relator, not on a question of fact which a trial court would leave to a jury, but on the construction and effect of certain agreements between the city and the railroads, the ordinance of the city and certain legislative enactments which relate to this subject. It may be conceded that the railroad companies changed the grade of these streets under their chartered powers and in pursuance of their chartered duties, but the legal question that arises upon this concession is whether such change of grade, made under the

·circumstances and with the authority of the city, does not impose upon the city a duty to provide by assessment for ·damages such as the relator suffered by reason of such changes in grade. In this last proposition a question of law arises, and the pleadings upon the record present that issue and that issue alone.

The writ sets out that the relator is the owner of lands and premises situate on Broad street, North Broad street and Morris avenue, in the city of Elizabeth ; that there have been ;erected on said lands certain buildings which are thereon standing ; that the grade of the street on which said lands front was duly established by a city ordinance passed on the ¯18th of June, 1856, and the said streets were opened, worked .and paved to the grade thus established ; that this grade continued to be the lawful and actual grade of said streets until .another ordinance was passed by the city, approved August 15th, 1893. The writ further recites that the city had power, under its charter and the general public laws of the ·state, to change the grade of any street or part of a street in said city upon which a house or building stood, or was or is ·erected, and that the ordinance of August 15th, 1893, was passed in pursuance of such power. It sets out that on December 24th, 1890, a contract was made by the city of Elizabeth with the United New Jersey Railroad and Canal Company, and on the 29th of December of the same year .another contract was made by said city with the Central Railroad Company of New Jersey. It further avers that, in carrying out the provisions of said contracts, it became and was necessary to cut down and lower the grade of said streets .in front of the lands of the relator to a considerable depth, whereby great damage ensued to the relator and to his lands and the buildings aforesaid ; that by reason thereof it became and was the duty of the city of Elizabeth and of the city council and of the board of commissioners of the city of Elizabeth to make or cause to be made a proper award to the relator for damages ensuing or arising to him as owner of said lands from the changes of grade aforesaid, with a prayer, &c.

The writ sets out the contracts with the railroad companies in full, and also the ordinance of August 15th, 1893. These contracts were made in December, 1890, and the ordinance was not passed until August, 1893.

The return of. the defendants to this writ admits that the relator was the owner of the lands designated in the writ, situate as therein stated, and that the grade of the streets on which said lands front was duly established by the ordinance of June 18th, 1856. It also admits that, during the years 1893 and 1894, the grade of these streets was changed and lowered. It avers that the said change of grade was not made or authorized by the city, but that the said change of grade was made by the railroad companies in accordance with the ordinance of August, 1893, under and by virtue of powers granted to these companies respectively by their charters. These are the substantial allegations in the defendants' return. The allegations of fact in the writ not traversed are admitted by the defendants.

By the city charter, the common council had power to order any street or section of a street to be graded. *Pamph. L.* 1863, *art.* 3, § 92, *p.* 145. By section 105, as matters stood under the city charter, the city had power to assess the costs and expenses of grading upon the owners of lands and real estate on the line of the street. *Id., p.* 149. The city had power, under its charter, by ordinance, to make changes in the grades of these streets. It also had power, in virtue of the act of 1874, to enter into contracts with the railroad companies to change or elevate their railroads within the city. *Pamph. L., p.* 45. The same act conferred upon the municipal authorities of the city power to vacate, alter the lines and change the grade of any streets or highways therein, and to do all such acts as might be necessary and proper to effectually carry out such contracts. But this act did not supersede the provisions of the city charter which provided for the manner in which the city authorities should legislate with respect to the change of grade. Contracts such as are pro-

vided by this statute, as well as the changes in grade, were municipal acts to be done, not by any officials who might come under the designation of authorities, but by the common council, exercising its powers in the manner in which that body, by the city charter, was authorized to perform its functions.

Separate contracts were made between the city and the two companies, which for present purposes were identical in terms and conditions. I shall refer to the contract with the Central Railroad Company, as that contract is more pertinent to the matter in controversy. That contract is between the Central Railroad Company of the first part and the city of Elizabeth of the second part. It purports to be executed in pursuance of the act of March, 1874, already referred to. The contract states that it was agreed by and between the parties that in virtue of the power and authority conferred by said act, and by virtue of all other powers and authority possessed by the parties or either of them for the purpose, that the railroad company should and might change the grade of their railroad in said city east of Broad street, as follows (specifying the changes of grade, including the grade on Broad street and Morris avenue) ; that the entire cost of elevating the tracks of the railroad and of the work required in making the changes in the location and grades of said streets should be paid by the railroad company ; that all land required for said purposes not owned by the city or the railroad company should be acquired by the railroad company or obtained by the city by condemnation proceedings, the award or awards therefor to be paid by the railroad company. The contract contained a stipulation that each party to this contract—that is, the city and the railroad company—should proceed to perform the acts and all of the acts therein required to be done by each party respectively, and that each party will at the request of the other exercise its respective franchises and take any action, corporate or otherwise, expedient or necessary to carry out the purposes of this contract, and that all proceed-

ings necessary to be had or taken to authorize changes in grade or vacation of streets for the construction of undergrade crossings, or the acquisition of lands required to carry out the purposes of this contract, should be taken and completed by the city, so that the railroad company should be enabled to do the work, and that all legal liability, if any, for damages to persons or corporations other than the railroad company, for changes of grade and vacation of streets and undergrade crossings for pedestrians, as provided in the agreement, should be assumed and paid by the city, but the work necessary to make such changes in grade, undergrade crossings, &c., should be done by and at the expense of the railroad company.

This contract, though valid under the act of 1874, did not operate *ex proprio vigore* to effect the change in the grade of these streets. Official action by the common council, as the governing body of the city, was necessary, and that official action could be taken only in conformity with the city charter, and the ordinance of August, 1893, constituted the official action of the city in the premises. That ordinance is entitled "An ordinance changing and establishing the grades of parts of certain streets and parts of Morris avenue." By the first section it is ordained by the mayor and common council of the city of Elizabeth " that the grades of parts of Broad street, North Broad street, East Broad street, West Grand street and Morris avenue shall be and the same are hereby changed and established as follows " (specifying the depression and elevation of these several streets, designating the extent of the change in the grades of the streets in precise measurements). The second section is as follows.: " That the Central Railroad Company of New Jersey, the Pennsylvania Railroad Company and the United New Jersey Railroad and Canal Company, or any of said companies, be and they are hereby authorized and requested to change the grades of said parts of streets and of said avenue,  *  *  * according to the foregoing provisions of this ordinance and on the terms and conditions stated in the contracts between the city of Elizabeth and said companies heretofore made."

The allegation in the return that this ordinance was not intended to change or authorize a change in the grade of the streets, nor to assume or incur any liability therefor, is wholly irrelevant to this issue. As between the relator, whose property was injured by the change of grade, and the city, the question as to what was intended by the city by this ordinance is immaterial. As between the parties the issue is as to the legal construction and effect of the ordinance. Nor is the averment that the ordinance was passed for the purpose of expressing the city's consent to a plan formulated by the railroad companies for abolishing grade crossings, and was not intended to have any other purpose and effect germane to this controversy. The ordinance and the contracts speak for themselves, and are to be construed according to their legal effect and not in conformity with purposes and intentions otherwise than such as are deduced from these instruments themselves. Nor is the contention of any substance that the ordinance is invalid for the reason that it was irregularly adopted, in that it was not passed by a vote of three-fourths of all of the members of the city council, as required by the charter in cases of ordinances involving the expenditure of money. This provision is contained in a supplement to the city charter passed April 4th, 1872. *Pamph. L., p.* 1192, § 20. This statute was before the Supreme Court, in *Suburban Electric Co.* v. *Elizabeth,* 30 *Vroom* 134. The ordinance then before the court provided for a contract for lighting the streets of the city. It was clearly a contract within the meaning of this statute as immediately involving the expenditure of public money. This ordinance is not to be regarded as an ordinance for the expenditure of city money within the meaning of the statute.

The damages to be paid to the owners of lands for change in the grades of streets, under the act of May 7th, 1889, are by that act required to be assessed upon and paid by lands and real estate benefited thereby in proportion to the benefits received. *Pamph. L., p.* 378. It will not be assumed that

adequate indemnity for damages paid will not be realized from that source. The argument of counsel fails to discriminate between payment of money out of the city treasury and duty to assess for damages, and also for benefits to provide a fund to pay damages, as provided in the act of 1889. Independently of that consideration, Suburban Railroad *v.* Elizabeth was decided on writ of *certiorari,* which brought the ordinance directly under review. The ordinance and its validity and effect are presented in this suit collaterally. Contracts such as those presented in this case the city was authorized to enter into in virtue of the act of 1874, and the ordinance in question was an ordinance such as the city council was authorized to pass. The contracts were duly made, the ordinance was passed as ordinances are usually passed, and the work has been done in compliance with it. The relator and those whose property was injured by the change of grade had no means of ascertaining by what vote the ordinance was passed except by inspecting the record of the common council. Under these circumstances the city will not be allowed, in this proceeding and in this collateral manner, to assail its own ordinance for irregularity after the object of the ordinance was completely accomplished.

The defendants also contend that this work was not done by these companies under any city authority, but under powers granted by the companies' charters and provisions in the General Road act, which, it is insisted, excludes responsibility of the city for damages sustained by owners of abutting property. The charters of these companies make it their duty to construct and keep in repair good and sufficient bridges over their railroads where any public or other road shall cross the same, and section 95 of the General Road act provides that railroads, in crossing the public highway, may alter the location of the highway at their own expense so far as shall be necessary to make such highway. pass over or under said railroad, and that such alteration shall be valid and of the same effect as if made by surveyors of the high-

ways according to law. *Gen. Stat.*, *p.* 2824. This last section is the act of March 26th, 1862. *Pamph. L.*, *p.* 326. The charter provision, so far as is applicable to the Central railroad, is section 9 of the act incorporating the Easton and Somerville Railroad Company. *Pamph. L.* 1847, *p.* 173. These two statutory enactments were before the Supreme Court in *Central Railroad Co.* ads. *State,* 3 *Vroom* 224, and the power of the company to change the grade of a road by carrying it under the railroad, where such a change was necessary for the convenience or safety of the public, was adjudged. But it will be observed that in that case, as well as in other cases of like import, the power of such companies to make changes in public highways arose under indictments in which the rights of the public only were involved, and in which rights of individual landowners whose property was injured or destroyed were not within the issue. *Warren Railroad Co.* ads. *State,* 5 *Dutcher* 353, is a similar precedent with respect to a corresponding power conferred on another railroad company. *Inhabitants of Greenwich* v. *Easton and Amboy Railroad Co.,* 9 *C. E. Gr.* 217; *S. C.,* 10 *Id.* 565, proceeds upon the same grounds. In no one of these cases was the question at all involved, even remotely, as to the right of landowners whose property was injured to have compensation. For injuries resulting from the violation or destruction of public rights, a private individual cannot have redress where no private right is injuriously affected. *Dodge* v. *Pennsylvania Railroad Co.,* 16 *Stew. Eq.* 351; *S. C.,* 18 *Id.* 366.

For a change in the grade of a street or highway in virtue of either the companies' charters or the Road act, no indictment could be maintained for the reason that the legislative provisions referred to made lawful such interferences with the public ways. But for injuries to private property neither the charter of the company nor section 95 of the Road act will be a justification. The constitution forbids the taking of private property for public use without compensation. The

only exception to this rule is that under certain circumstances,. and in the absence of liability imposed by statute, municipal corporations might take or injure private property without any liability to make compensation.   This immunity does not extend to persons or other corporations, although the latter may be created for public purposes ; and the destruction of private property, either total or partial, or the diminution of its value by the act of government directly and not merely incidentally affecting it, which deprives the owner of the ordinary use of it, is a taking within the constitutional provision,. and can only be exercised under the right of eminent domain on just compensation made.   *Trenton Water Power Co.* v. *Raff,.* *7 Vroom* 335 ; *Costigan* v. *Pennsylvania Railroad Co.*, 25 *Id.* 233.   The act of 1874, which is the foundation of the whole of this proceeding, lodges the power to change the location and alter the grades of streets in the city government and not in the railroad companies.   Without the sanction and authority of the city, the alteration of the streets and changes in the grade were illegal.

In the case of *Reed* v. *Camden*, 24 *Vroom* 322, 327, proceedings under the act of 1874 were sustained, notably on the ground that in the course thereof compensation was made to landowners for the injury done to them by the change of grade.   Mr. Justice Scudder, delivering the opinion of the court, said : " The city authorities are acting within the terms of their charter, and provision is made for the payment of any special damages which the plaintiff may show that she will sustain; there will be, therefore, no taking of private property or injury inflicted without just compensation."   If the work in question was done under the sanction of the companies' charters or of the Road act exclusively, the companies were trespassers and would be liable to the relator for his damages.   In such an action the city charter, the ordinance and the authority of the city conferred by the contracts would be the only legal justification available.   The contract recites that it was made for the mutual benefits and advantages of

the city and of the railroad companies.   It stipulates that the company shall and may change the grade of their railroad, and that in order to provide undergrade crossings certain changes shall be made in the grades, lines and locations of the streets and avenues.   It contains also a covenant on the part of the city to use its condemnation proceedings to obtain lands required for such purposes, and an assumption by the city of all legal liability for damages to persons or corporations other than the railroad company for changes of grade and vacation of streets.   The only duty on the part of the company is to do the work at its own cost and expense.   The contract is as essentially a contract of employment by the city as if the work had been done by a contractor and his workmen.   It differs only in the fact that in the latter case the city would pay the cost of the work, and in the former case the expense of doing the work was borne by the railroad company in consideration of the benefits derived from changing the location of its railroad.   The contract recites that it was made in virtue of the powers conferred by the act of 1874 and of all other powers and authority possessed by either of the parties.   It stipulates that all proceedings necessary to be had or taken to authorize changes of grade, or the vacation of streets, or the construction of undergrade crossings, shall be taken and completed by the city.   The ordinance is entitled "An ordinance changing and establishing the grades of parts of certain streets and parts of Morris avenue."   It ordains that the grades of the streets in question shall be and the same are changed and established as set out in the ordinance, and ordains that the said companies be authorized and requested to change the grades of said streets on the terms and conditions stated in the contracts between the city and the companies.   It would be an unfair and unjustifiable construction of this ordinance and of these proceedings to give the latter substance enough to be interposed between the relator and the company in a suit for damages, and be inefficacious to confer on the relator such relief from the city as its charter

and the general law of the state afford.   The work having been done by the procurement of the city, and the changes in the grades of the streets being lawful so far as individual owners of property injured are concerned, only in virtue of the action of the municipal authorities, the remaining question is under what conditions and subject to what liability the city was authorized to make such changes in the grades of the streets.

At common law a municipality was not liable to abutting owners for damages caused by changes in the grades of streets, and such is the law at the present time unless liability is imposed by express statutory authority.   The act of 1858, entitled "An act to define the rights of parties whose property is damaged or taken for public use in cases of the alteration of the grades of streets or highways," gives an action in behalf of any person owning any house or other building standing and erected upon any street or highway the grade whereof shall be altered by virtue of the ordinance, resolution or other proceeding of the legislative authority of any city, borough or town corporate in this state to recover from the said city, borough or town corporate all damages which such owner shall suffer by reason of the altering of any such grade.   The second section repeals all provisions in any charter or law of this state whereby the expenses of working any grade established in lieu of a former grade existing and according to which buildings have been erected are directed to be borne by the owners of land in any street or highway so graded, with a proviso in the third section that these provisions shall not apply to any city, town or borough whose charter provides for assessing and paying compensation to persons injured by the making of grades established or to be established.   The fifth section enacts that the damages mentioned in the act to be paid to such owners shall be assessed upon and paid by the lands and real estate benefited thereby in proportion to the benefits received, and such damages shall be ascertained, estimated and assessed and the amount thereof

be justly and equitably assessed and apportioned upon the lands and real estate benefited thereby, by commissioners to be appointed, and who shall act in all things in the same manner as now provided in the charters of the several cities, boroughs and towns corporate in this state for the laying out, opening, altering or widening of any street, highway, road or alley, and all proceedings in such matters shall be in conformity with and analogous to the proceedings directed and the privileges allowed in such charters. *Pamph. L.* 1858, *p.* 415; *Gen. Stat.*, *p.* 2820, ¶¶ 70–75. This act applied to all municipalities, including the city of Elizabeth.

By a supplement to the charter of the city of Elizabeth, passed in 1864, it was enacted that the act of 1858 should not affect or refer to the city of Elizabeth. *Pamph. L.*, *p.* 644. The act of 1864 was passed before the amendments of 1875 to the constitution were adopted, and the city of Elizabeth was thereby exempted from the liability in that respect imposed on the other municipalities of the state.

Then followed the act of May 7th, 1889. *Pamph. L.*, *p.* 378. This act is entitled "An act relating to the change of grade of streets in cities of this state." It provides by the first section that where any city of this state has power to change the grade of any street or part of a street upon which any house or other building stands or is erected, it shall be lawful for the municipal authorities in any such city, through its proper officers, to make or cause to be made a proper award for damages, if any, ensuing or arising to the owner or owners of any such house or building standing and erected upon any such street or part of a street the grade whereof is changed as aforesaid. The second section provides that the damages to be paid to such owner shall be assessed upon and paid by the lands and real estate benefited thereby in proportion to the benefits received. By the third section all acts and parts of acts inconsistent with the provisions of the act were repealed. This act, by its title, relates to "cities of this state," and the introductory part of the first section demonstrates the

generality of its application. The language used is "any city of this state," and the city of Elizabeth is included within the descriptive words that follow, "having power to change the grade of any street or part of a street."

The act of 1889 was passed after the amendments of 1875 to the constitution, which forbade special and local laws and required all legislation regulating the internal affairs of municipalities to be by general laws, and was cast in the form of a general law to conform to the constitutional amendment. I am not aware that any other city except Elizabeth had been exempted from the provisions of the act of 1858. The act, which applies to cities only, omitting boroughs and towns, was probably designed to place the city of Elizabeth on the same plane in this respect with the other cities of the state. Be that as it may, the act applies to the city of Elizabeth ; necessarily so, or otherwise it would have come within the constitutional interdict of special and local laws. *Bowyer* v. *Camden*, 21 *Vroom* 87 ; *Hoetzel* v. *East Orange, Id.* 354. It also contains an express repealer of all acts and parts of acts inconsistent with its provisions, and being a public act relating to cities of this state, must necessarily as a matter of construction operate as a repealer of the provisions of the city charter of 1864 which exempted that city from the provisions of the act of 1858. Otherwise the construction would be at variance with the title as well as the enacting part of the statute.

The course of legislation on the subject of compensation for damages resulting from changes in the grades of streets disposes of the contention that this act applies only to cities which theretofore were liable for damages arising from changes in the grades of streets, and simply substituted a new method of assessing the damages in place of a suit as provided for by the act of 1858. The act by its title is a general act, applicable to the "cities of this state," and *all* inconsistent legislation is repealed. The act having been passed after the constitutional amendments of 1875, as already said, would become

unconstitutional if its provisions be restricted to certain cities of the state, namely, those only that were previously liable in damages for changes in the grades of streets. If there were any doubt whether the city of Elizabeth was included in this legislation, as a mere matter of construction, the constitutional objection to the statute which would prevail if it were construed otherwise should fix and determine the construction and effect of this legislation. A different construction would convert " cities " in the title and " any city " in the body of the act into certain cities, viz., cities having already by the act of 1858 the power to assess for benefits, and expunge the words " having power to change the grade of any street or part of a street." Neither the title of the act nor the body of it will permit such a restriction of the enacting part, nor can such a construction stand within the constitutional interdict of local and special laws.

But it is contended that the act of 1889 confers simply a discretionary power. This contention rests upon the words " it shall be lawful for the municipal authorities in any such city to make or cause to be made a proper award for damages," &c. This contention cannot be yielded to. Words which, in their ordinary acceptation and when interpreted exclusive of the context and the subject-matter, imply a discretion or power, such as " may," " it shall be lawful," and the like, become in the construction of statutes mandatory where such is the legislative intent. The general rule is stated as follows: " Where a statute confers authority to do a judicial, or, indeed, any other act, which the public interest or even individual right may demand, it is imperative on those so authorized to exercise the authority when the case arises, and its exercise is duly applied for by a party interested and having a right to make the application. In giving one person the authority to do an act the statute impliedly gives to others the right of requiring that the act be done, the power being given for the benefit not of him who is invested with it, but of those for whom it is to be exercised. The

legislature in such cases imposes a positive and absolute duty, and not merely gives a discretionary power; and it must be exercised upon proof of the particular facts out of which the power arises. When, therefore, the language in which the authority is conferred is only directory, permissive or enabling—for instance, when it is enacted that the person authorized 'may,' or 'is empowered,' or 'shall if he deems it advisable,' or that ' it shall be lawful' for him to do the act— it has been so often decided as to have become an axiom that such expressions have a compulsory force, unless there be special grounds for a different construction." *Maxw. Int. Stat.* 218, 219.

In *Supervisors* v. *United States*, 4 *Wall.* 435, 446, Mr. Justice Swayne uses this language: "The conclusion to be deduced from the authorities is that where power is given to public officers in the language of the act before us, or in equivalent language—whenever the public interest or individual rights call for its exercise—the language used, though permissive in form, is in fact peremptory. What they are empowered to do for a third person the law requires shall be done. The power is given, not for their benefit, but for his. It is placed with the depositary to meet the demands of right and to prevent the failure of justice. It is given as a remedy to those entitled to invoke its aid and who would otherwise be remediless. In all such cases it is held that the intent of the legislature, which is the test, was not to devolve a mere discretion, but to impose ' a positive and absolute duty.' ".

The act of 1858 was designed to subvert the policy that previously existed of permitting changes in the grades of streets and highways in cities, boroughs and towns corporate to the injury of abutting owners without compensation to them. By its title it declares its purpose to define the rights of persons whose property is damaged by alteration of grades, and it gives an action to all persons so injured to recover their damages. The only exception from the generality of this statute is of cities, towns or boroughs whose charters

provide for assessing and paying compensation for such injuries. In *Lambertville* v. *Clevinger*, 1 *Vroom* 53, 54, Mr. Justice Elmer said : " The object of the act was, in accordance with the settled policy of our laws, to compensate the owners of property for injuries occasioned by acts of the public authorities for the benefit of others. It is a remedial act and ought to be interpreted liberally rather than strictly." In *State* v. *Seymour*, 6 *Vroom* 47, 53, Mr. Justice Scudder, speaking of the condition of the law prior to the adoption of the constitution of 1845, which gave the legislature power to take lands for public highways without compensation, said : " Such was the settled construction of our law, and it was acquiesced in by all, though the hardship and injustice of such deprivation of property was more noticeable as land became more densely settled. In the new constitution this subject was still left under legislative control. It was not until the act of March 1st, 1850, that the surveyors of highways, in laying out roads, were required to adjudicate the damages to each landowner. After the legislature have thus, in exercising the discretion committed to them by the constitution, changed the policy of our law, in a manner so accordant with the principles of natural law and exact justice, I should be unwilling to hold that they could take a step backward, and thereby reimpose this onerous servitude upon private property." In *Ward* v. *Peck*, 20 *Vroom* 42, the Supreme Court went further, and held that that portion of the forty-fifth section of the General Road act which authorized overseers to enter into private property and cut and make drains was void, as being inconsistent with the constitutional provision that declares that private property cannot be taken for public uses without compensation. This decision was placed upon the stable ground that the constitution and those statutes which require compensation for lands taken for public use had established a public policy with which the law in question was in conflict.

The act of 1858 wrought a radical change in the common

law rule which prevailed theretofore in cities, boroughs and towns corporate of this state. The contention that the act of 1889 shall receive a construction that will make the action of the municipal authorities of cities discretionary, from the use of the words " it shall be lawful," rests upon the assumption that the legislature intended to subvert the settled policy of the law established by the act of 1858, and substitute in its place a power on the part of municipal authorities of cities to make compensation or not to make compensation in their discretion.

The argument leads beyond the limit of permitting the several cities to adopt the general policy of compensating or not compensating owners of lands for injuries arising from changes of grade within the city limits. It would vest this discretionary power in each city with regard to particular streets or even to individuals. It would mean that it was within the competency of the municipal government to pay A for the injuries he had sustained, and deny B compensation for corresponding injuries. I am unwilling to adopt that construction of the act of 1889. The act was obviously not designed to subvert the policy established by the act of 1858. Its purpose, as indicated by the title of the act and the introductory part of the enactment, was to extend the policy established by the act of 1858 to all the cities of this state. Compensation to owners of lands for damages caused by the alteration in the grades of public streets and highways is (to adopt the language of Mr. Justice Scudder) " so accordant with the principles of natural law and exact justice that I should be unwilling to hold that the legislature could take a step backward, and thereby reimpose this onerous servitude upon private property." The power granted to the city authorities to assess damages and assess for benefits as a means of compensating the owners of lands for injuries from changes in the grades of streets was conferred upon these officials, not for the benefit or advantage of the inhabitants or taxpayers of the city, nor for city purposes in the administration of

municipal affairs.   The power is one that exists for the benefit of the persons injured by such public improvements as the parties interested, and the authority to have an assessment of damages made is a power given for their benefit, and, although expressed in language in form discretionary, is in reality upon settled legal principles imperative.

The judgment of the Supreme Court should be reversed and judgment final be entered in favor of the relator, that a writ of *mandamus* do issue in conformity with the prayer of the alternative writ.

COLLINS, J. (dissenting).   Certain streets in the city of Elizabeth were depressed so as to carry them under two intersecting railroads.   The relator owned lands, with buildings thereon, fronting on those streets.   He sought a *mandamus* to compel the municipal authorities to make him an award of damages.   The cause was heard upon a rule to show cause, as if on alternative *mandamus*, the parties stipulating that upon the decision of the rule the pleadings should be so moulded, under direction of the court, as to give either party the right to a writ of error.

The Supreme Court rendered this decision :

" PER CURIAM.

" We think the proper inference from all the circumstances of this case is that the grade of the streets was changed by the railroad companies under their chartered powers and in pursuance of their chartered duties, in order to render the highways safe and convenient for public use.

" For damages caused to abutting owners by such change of grade, the statutes do not seem to have imposed any legal liability upon the municipality in which the streets are located, and the mere fact that the city consented to the change is not enough to cast such liability upon it.

" The prayer for *mandamus* will be denied, upon pleadings so framed as to carry out the stipulation of the parties."

The pleadings were framed under the stipulation, and consist of an alternative *mandamus*, a return thereto, a demurrer to the return and joinder thereon. Upon the resultant judgment in favor of the defendants this writ of error was brought.

The record discloses the following facts admitted by the demurrer :

The grades of the streets involved were established by ordinance of the city of Elizabeth on June 18th, 1856, and the streets were opened, worked and paved on the grades thus established. After the erection of relator's buildings, the city, by resolutions receiving less than a three-fourths vote of the entire council, made separate contracts—one with the United New Jersey Railroad and Canal Company and the Pennsylvania Railroad Company, lessee, dated December 24th, 1890, supplemented December 10th, 1891, October 27th, 1892, and January 3d, 1893, and one with the Central Railroad Company of New Jersey, dated December 29th, 1890, supplemented October 27th, 1892, and December 30th, 1892. The contracts recited that they were made in pursuance of "An act to authorize any city of this state to enter into contracts with railroad companies whose roads enter their corporate limits, whereby said companies may relocate, change or elevate their railroads, and, when necessary for that purpose, to vacate, change the grades of or alter the lines of any streets or highways therein," approved March 19th, 1874 (*Rev., p.* 944), and by virtue of all other powers and authority possessed by the parties or either of them for that purpose. They further recited that to elevate the grade, through the city, of the railroads respectively, and to vacate, alter the lines and change the grades of certain streets as thereinafter provided would secure greater safety to persons and property in the city and promote the interests thereof and increase the capacity of the railroad companies for transacting business. They provided for extensive changes in tracks and streets, involving vacation of some streets and depression of others. It was agreed that in order to provide undergrade crossings for pedestrians and

vehicles of all kinds the specified changes in grades of streets should be made by the railroad companies, or one of them, at their own cost. On August 15th, 1893, an ordinance was introduced in the city council and passed at the same meeting, wherein it was ordained that the grades of certain streets should be changed and established as specified—being in - accordance with said contracts—provided that for the purpose of easing the approach of existing grades to the grades thereby established the streets at the head of the new grades should be depressed not exceeding one foot, and sloped therefrom for a distance of forty feet in either direction so as to form a gradual and easy ascent. By this ordinance the railroad companies were authorized and requested to change the grades of said streets according to the provisions of the ordinance and on the terms and conditions stated in the contracts. The ordinance did not embrace all the streets the grades of which were changed under the contracts, but did include those in front of relator's lands.

The relator pleads that at the time of the passage of the ordinance the city had power, under the provisions of its charter and the general public laws of this state, to change the grade of any street upon which any house or other building stood, and that the ordinance was passed in pursuance of such power; that in carrying out the provisions of said contracts it became and was necessary to cut down and lower the grade of the streets in front of his lands to the depth of eight feet, in such manner as to conform them to the new grades established by the ordinance, and that the streets were cut down accordingly, in the manner and by the persons mentioned in said contracts and in accordance therewith and with said ordinance; that damages thereby ensued to the relator and that it thereupon became the duty of the defendants to make him an award therefor.

The defendants, in their return, cite the city charter (*Pamph. L.* 1863, *p.* 109) and plead that the ordinance of August 15th, 1893, was passed for the purpose of expressing the consent

of the city to the plan formulated by the railroad companies for abolishing grade crossings, and could not impose any liability on the city, and that the changes in the grades of the streets were made by the railroad companies, in accordance with the ordinance and contracts, but under and by virtue of provisions in their charters cited. *Pamph. L.* 1832, *p.* 96, as to one company, and *Pamph. L.* 1831, *p.* 80, and *Pamph. L.* 1847, *p.* 128, as to the other.

When a statute or document speaks of changing a street grade the meaning of the words used must be determined by the context. Standing alone, such words are ambiguous. They may mean either making the actual change or effecting the legal change or both. For an actual change only are damages awarded under our statutes. In the case in hand it is admitted that the railroad companies contracted to make and did make the actual change. Their authority to do so under municipal consent is indisputable. Without such consent in a case of reasonable necessity they had power to make such change and were under obligation to use their power. Their charters are alike in this respect. The pertinent provision is as follows: "It shall be the duty of the said company to construct and keep in repair good and sufficient bridges or passages over or under the said railroad or roads where any public or other road shall cross the same, so that the passage of carriages, horses and cattle on said road shall not be impeded thereby." One of these charters came before the Supreme Court in the case of *Central Railroad Co.* ads. *State*, 3 *Vroom* 229, and Chief Justice Beasley said: "The duty prescribed is to keep, at all times and under all circumstances, the public highways, at the point where they cross the railroad, in a condition fit for safe and convenient use. In order to accomplish this end, the power to alter the grade of the road as public emergencies require so as to pass it, if necessary, under the track, must reside in the corporation." For the changes of grade, therefore, the authority of the Contract act of 1874 was not needed, but as the general plan to

abolish grade crossings involved other things not within the power of the companies, it was proper to embrace all in the contracts. The whole subject thus came within the municipal consent and was put on a sure footing.

It is evident that the city's ordinance of August 15th, 1893, was a mere adjunct to the contracts previously made. Probably no ordinance was necessary under the act of 1874, and it is difficult to see why one was passed at all unless as authority, in lieu of further supplemental contracts, for the making by the railroad companies of the slight changes specified in the proviso of the ordinance, at the head of the new grades. It cannot be successfully contended that this ordinance works a difference in the subject of the contracts and puts some of the depressed streets upon a legal basis different from the others. Whatever may have prompted the ordinance, it could not have been intended thereby to impose pecuniary liability upon the city or upon assessable property, for it was not an ordinance of the character of those devolving such a liability. In Elizabeth it is essential to the validity of an ordinance involving the expenditure of money that it be published in a newspaper printed and published or circulating in the city for the space of two weeks, between a second and third reading. *Pamph. L.* 1863, *p.* 117, § 29. This ordinance was introduced and passed at the same meeting. The contracts upon which the ordinance was based must, under the act of 1874, be made by the " proper municipal authorities." Such authorities, under the charter of Elizabeth (*Rev. Sup.* 1872, *Pamph. L.*, *p.* 1192, § 20), include as necessary factors three-fourths of the members of the entire council where a resolution or ordinance involves the expenditure of money. There was no such vote for these contracts. If there were any statute entailing on Elizabeth a liability in damages for a lawful change in street grades, the city would perhaps be estopped from pleading the invalidity of its municipal action as a reason for non-liability thereunder for a change actually made, but there can be no estoppel against

demonstrating, from the character of the municipal action, that such action was a mere assent to an actual change of grades by other corporations under lawful authority, and must have been so understood by all concerned. The relator could not have relied, to his hurt, upon this ordinance. By its very terms the railroad companies were authorized and requested to change the grades of the streets on the terms and conditions of the contracts. There is no ground for holding that, in doing the work, the railroad companies acted as agents of the city. The inference of the Supreme Court, therefore, is fully sustained.

If, however, this were doubtful, or if it could properly be inferred that the city, in legal contemplation, did change the grades, the judgment of the Supreme Court should nevertheless be affirmed.

Lawfully authorized changes by municipal corporations in the grades of public highways involve no constitutional right of compensation to the owners of adjacent property. No right of compensation exists unless conferred by statute. *Cooley Const. Lim.* 542; *Plum* v. *Morris Canal and Banking Co.,* 2 *Stock.* 256; *Citizens' Coach Co.* v. *Camden Horse Railroad Co.,* 6 *Stew. Eq.* 267, 276; *Transportation Company* v. *Chicago,* 99 *U. S.* 635.

The charter of Elizabeth confers no right and imposes no liability in this regard, and a supplement (*Pamph. L.* 1864, *p.* 644, § 9) excepts that city from the provisions of the general law on the subject (*Pamph. L.* 1858, *p.* 415, now sections 70 to 75 of the Road act, *Gen. Stat., p.* 2820). This much is conceded in the opinion read for this court, but it is therein declared that authority for an award, collectible by assessment on property benefited, is conferred by "An act relating to the change of grade of streets in cities of this state," approved May 7th, 1889 (*Gen. Stat., p.* 592), under which statute the alternative *mandamus* in this case was framed. I cannot assent to this view.

The act in terms applies only " where a city has power to

change the grade of any street or part of a street upon which any house or other building stands or is erected." I find in the charter of Elizabeth no express power to change a grade once established and worked. An earlier charter (*Pamph. L.* 1855, *p.* 229, § 21) gave power by ordinance to "regulate and determine the levels, grade and construction of streets." Under this power the pleaded ordinance of 1856 must have been adopted. The revised charter (*Pamph. L.* 1863, *p.* 118, § 31, ¶ 7; *Id., p.* 121, § 31, ¶ 31; *Id., p.* 145, § 92, ¶ 3) gives power to "regulate, clean and keep in repair the streets," to "level, grade, curb and pave, flag or gravel the sidewalks of the streets," and to "cause any street or section of a street to be graded, graveled, paved, flagged, macadamized or otherwise improved and regulated." But I find nothing more, except in a supplement of 1869 (*Pamph. L., p.* 1092, § 2) where power is given to "establish grades or a system of grades for the streets or avenues in the city." Perhaps a power of change may be implied from these provisions. *Town of Lambertville* v. *Clevinger*, 1 *Vroom* 53. If there is no such charter power, express or implied, the act of 1889 is ineffective in Elizabeth unless it operates upon the power granted by the Railroad Contract act of 1874.

But granting such power, it is, in my opinion, more than doubtful if the act of 1889 can be applied in a city where there is no municipal liability for grade changes. It is an incomplete and imperfect statute, and can be given due effect only when applied to city charters imposing such a liability or to the Road act. The fair construction of the first section involves nothing more than a purpose to substitute for the remedy by action at law, bestowed by the Road act, one by municipal award. The second section regulates in all cases the mode of assessing benefits. The mischief the act was meant to remedy was that there were two methods of procedure recognized by the old law—one where a city's charter provided for assessing and paying compensation for changes

of grade, and the other where the Road act alone gave a right to compensation.    The remedy was to prescribe uniformity.

This is made evident by comparison :

<div style="display:flex">

**ROAD ACT.**

" 70. That an action upon the case doth and shall lie in behalf of any person owning any house or other building standing and erected upon any street or highway, the grade whereof shall be, or shall have been altered by virtue of the ordinance, resolution or other proceeding of the legislative authority of any city, borough or town corporate in this state, to recover from the said city, borough or town corporate, all damages which such owner shall suffer by reason of altering any such grade.

\*    \*    \*    \*    \*    \*

" 72. That the foregoing provisions respecting grades shall not refer to any city, town or borough whose charter or any supplement thereto now existing, or which shall hereafter be passed, provides or shall provide for assessing and paying compensation to persons injured by the making of grades established or to be established.

" 73. That the grade of no street, in any city or town which has been built on, shall be altered, unless by the consent of a majority of owners in interest of the lots fronting on the part proposed to be altered, nor without paying to the owners of such buildings the damages sustained by the alterations of such grade."

**ACT OF 1889.**

" 1. That where any city of this state has power to change the grade of any street or part of a street upon which any house or other building stands or is erected, it shall be lawful for the municipal authorities in any such city, through its proper officers, to make or cause to be made the proper award for damages, if any, ensuing or arising to the owner or owners of any such house or other building standing and erected upon any such street or part of a street, the grade whereof is changed as aforesaid.

" 2. That the damages mentioned in this act to be paid to such owner shall be assessed upon and paid by the lands and real estate benefited thereby, in proportion to the benefits received, and such damages shall be ascertained, estimated and assessed, and the amount thereof shall afterwards be justly and equitably assessed and apportioned upon the lands and real estate benefited thereby, by such municipal authorities, through its proper officers, as aforesaid."

</div>

Contrast the words " the proper award for damages, if any, ensuing or arising to the owner," in the latter act, with the words " an action    \*    \*    \*    to recover    \*    \*    \*    all damages which the owner shall suffer," in the earlier act.    In

case of a change in a street grade, damages—that is, compensation—ensue or arise to an owner by legislative provision, whereas damages—that is, injury—are suffered by the physical act of alteration whether compensation arise or not. That the contingency of non-liability was contemplated in the act of 1889 is shown by the use of the words " if any " and " proper award." Solution in any given case will depend upon the existence or non-existence of a legislative authority for compensation by which alone can be tested the " propriety " of an award. ·

The true conclusion, however, is that the act of 1889 has no relations at all to changes of grade resulting from the joint action of a city and a railroad company under the Contract act of 1874. It relates only to action taken for purely municipal purposes or where a city acts for the owners of the property affected.

The expression of the authority given by the act of 1874 to " change the grades " of streets includes power to make an actual change as well as to effect a legal change, and in either case the power is unlimited. The same section (73) of the Road act that gives damages for alteration of grades provides that the grade of no street in any city or town which has been built on shall be altered unless by consent of the majority of owners in interest of the lots fronting on the part proposed to be altered. In *Read* v. *Camden*, 25 *Vroom* 347, where the Railroad Contract act of 1874 was upheld and declared to have an object highly beneficent, it was adjudged that this requirement of consent of landowners was abrogated as to contracts within the act of 1874. The provision for compensation where in force was likewise overridden. Later general statutes addressed simply to municipal action should not be held to apply to special powers conferred for public purposes. For example, an act passed now, providing that grades of streets should not be changed without consent of landowners, would have no more effect upon the powers of the act of 1874 than had the provisions of the previous act

of that purport held by this court to have been thereby superseded.

It is, of course, possible for a city, when contracting with a railroad company, under the act of 1874, to exact or afford compensation to landowners damaged by grade changes (*Read v. Camden, ubi supra*), but neither under that act nor any later statute is there legal obligation to do so.

It has been said that when a street grade has been officially established, and particularly when improvements have been thereafter made according to such established grade, and it is afterwards changed, to the injury of abutting owners, there is a strong natural equity in their favor for compensation. *Dill. Mun. Corp.*, § 995 *b*. This consideration should have been addressed to the municipal authorities of Elizabeth when they were making these contracts, or may be addressed to the legislature now. If now, after the railroads have been elevated and property has been adjusted to the new conditions, it can be demonstrated that some landowners have been made to suffer for the public benefit, it is within the legislative power to put the burden where it belongs. The city did, in these contracts, agree with the railroad companies to assume all legal liability, if any, for damages for the change of street grades. If it had been equitable to require the companies to pay the actual damages, we may presume that such payment would have been exacted. Whatever equity, therefore, exists is against the city.

In *Shackelton* v. *Town of Guttenberg*, 10 *Vroom* 660, 665, Mr. Justice Dixon said, with reference to a just municipal indebtedness for which there was no legal means of payment: "Though the powers delegated for the payment of these debts may have proved inadequate, and it may be convenient and just that they should be made sufficient, yet, as we have seen, it is not within the scope of judicial authority to eke them out by dubious presumptions. Creditors whose rightful claims cannot be satisfied by their exercise must seek further aid from the legislature, on whose faith they may safely rely. The creditors of the state itself stand secure upon this basis."

So, in this case we ought not to eke out inadequate powers in order to enforce a "natural equity" against the public. If there be such an equity in this case, its accomplishment is a legislative function. The present proceeding will not accomplish it. An award of damages collectible only from assessments of benefits will be of little value to the relator. There can hardly be any special benefit from the changes in grade *per sese*, and the general benefit arising from the abolition of a grade crossing of the railroads will not be assessable.

I shall vote to affirm this judgment.

I am authorized to say that Justices Garrison and Ludlow and Judge Bogert concur in this opinion, and that Judge Vredenburgh interprets the act of 1889 as not applicable in Elizabeth.

*For affirmance*—COLLINS, GARRISON, LUDLOW, BOGERT, VREDENBURGH. 5.

*For reversal*—THE CHANCELLOR, DEPUE, GUMMERE, VAN SYCKEL, ADAMS, HENDRICKSON, NIXON. 7.