THE INHABITANTS OF THE TOWNSHIP OF PALMYRA

*v.*

PENNSYLVANIA RAILROAD COMPANY.

[Filed October 28th, 1901.]

The statute of March 16th, 1898 (*P. L. of 1898 p. 110*), authorizes the governing body of a township, when it shall be of opinion that gates, &c., should be erected at a specified grade crossing of a highway, to pass an ordinance directing an application by petition to this court for a summary inquiry to decide whether a flagman or gates and bars, &c., should be provided by the railroad company at that particular crossing for the security of human life, &c. Such an ordinance has been passed, petition filed and hearing had, as to the Pennsylvania Railroad Company's crossing of Cinnaminson avenue in the township of Palmyra. On the inquiry it is found as a fact that the railroad company has so located its station-house building that Cinnaminson avenue crossing has been made additionally dangerous. On this showing of the fact it is—*Held*, (1) that the statute of March 16th, 1898, is not an impairment of any contractual right vested in the Camden and Amboy Railroad Company by its charter (*P. L. of 1830 p. 83*), under which the Pennsylvania Railroad Company is operating by lease; (2) the statute of March 16th, 1898, does not confer upon this court the exercise

of a power which properly belongs to the legislative department of the government of this state, and is not obnoxious to article 3, section 1, of the constitution of this state; (3) the powers conferred upon this court by the statute of 1898 do not intrude upon those which inherently belong to the supreme court of this state; (4) the authority given by the statute of 1898 to this court is consistent with its general equity jurisdiction and accords with its modes of procedure, and in the case under consideration may rightfully be exercised.

This is a petition filed by the township committee of Palmyra township, Burlington county, praying that the Pennsylvania Railroad Company may be ordered to erect gates to protect travel across its tracks at Cinnaminson avenue in that township.

The application is made under the law of March 16th, 1898 (see *P. L. of 1898 p. 110*), which authorizes the governing body of any township, when it shall be of opinion that it is necessary for the security of human life, or the protection of the public, that gates should be erected across a public road where it is crossed by a railroad track at grade, or that a flagman should be there stationed to give notice of approaching trains, or that some other reasonable provision for protecting such crossing should be adopted, to pass an ordinance authorizing and directing application· to be made by petition to this court for such order as it may deem necessary in the premises. The statute directs this court, after notice given to the railroad company, to proceed in a summary way to investigate the circumstances of the case and to decide whether such protection is necessary, and to make an order that a flagman, or gates and bars, or some other reasonable provision for protecting such crossing should be adopted by such railroad company. The railroad company is directed to comply with such order, and compliance may be enforced by the appropriate process of this court. The court shall decide what, if any portion, of the expense of establishing gates and maintaining a flagman shall be borne by the municipality.

The township of Palmyra adopted such an ordinance and has filed its petition by its township committee, alleging that the village of Palmyra has a population of two thousand three hundred; that the tracks of the Amboy division of the Pennsylvania Railroad Company run through it for six thousand two hundred and seventy-one feet; that all the village streets cross the tracks

at grade, and none are protected by gate or flagman; that Cinnaminson avenue is the principal street of the village, and crosses the railroad right of way, west of its station; that stores, buildings and improvements are located on both sides of the tracks; that large numbers of teams and people are compelled to, and do, cross the tracks at Cinnaminson avenue; that the railroad company runs four express trains and great numbers of freight trains which do not stop at Palmyra; that a grove of trees, and the railroad station itself, obstruct the view of persons about to cross the tracks; that the petitioner is of opinion that it is necessary for the security of human life and the protection of the public that gates should be erected across Cinnaminson avenue at the railroad crossing, or that a flagman should be there stationed to give notice of approaching trains, or that some other reasonable protection should there be provided; and prayer is made for an investigation of the circumstances of the case and for an order accordingly.

Upon the filing of this petition an order to show cause was made for a hearing by oral proof in a summary way.

The railroad company filed an answer to the petition admitting the frequent running of its trains over the crossing at Cinnaminson avenue, but alleging that as to those express passenger trains which did not stop at Palmyra, it caused its agent there "to flag the crossing over Cinnaminson avenue during the time said trains pass over said crossing;" that the non-stopping freight trains principally run at night. It denies that at Cinnaminson avenue there is no protection. Alleges that, because of a wide street beside the right of way, a clear and unobstructed view up and down the railroad can be obtained of approaching trains; that the crossing in nowise endangers human life and needs no additional protection for the public than is afforded by the law requiring the giving of the statutory signals on approaching a crossing.

The railroad company's answer further refers to the charter granted to the Camden and Amboy Railroad Company in 1830 (*P. L. of 1830 p. 3*), under which, and subsequent consolidations and leases, it is now operating its railroad, and sets up the privilege given under that act to cross, at grade, streets along its route, and avers that Cinnaminson avenue is one of the streets

so crossed by its railroad tracks, and that a passage has been there constructed and maintained over said street as required by said charter; that the legislature has prescribed certain precautions in approaching grade crossings as to blowing whistles and ringing a bell, which its trains have always observed on approaching Cinnaminson avenue.

The railroad company, before the hearing, amended its answer by averring that it had always discharged its legal obligations in the premises; that if there is in fact any unusual danger at the Cinnaminson crossing, it was not occasioned by any act done in the location and construction of the railroad, its buildings or works, and that such unusual danger is chargeable wholly to the subsequent growth and building up of that locality.

The company insists that under such circumstances no further obligation rests upon it than the statutory blowing of a whistle and the ringing of a bell, and that such is the true construction of the act of March 16th, 1898; that any other construction of that statute would be an assumption by this court to

"exercise a function not judicial but legislative in its nature and obnoxious to article 3 of the constitution of this state, incapable of being conferred upon or exercised by this honorable court, or by any person belonging to the judicial department of the government of this state; that said statute to that extent would be and is unconstitutional and void, and the railroad company asks the same benefit as if it had demurred to the application of the township of Palmyra."

The matter was subsequently heard upon oral examination and cross-examination of witnesses and the exhibition of proven maps and photographs of the *locus in quo.*

*Mr. Thomas E. French,* for the petitioner.

*Mr. Joseph H. Gaskill* and *Mr. Alan H. Strong,* for the respondents.

GREY, V. C.

The proofs taken in the summary hearing of this matter show the circumstances at the Cinnaminson crossing at Palmyra to be as follows: The railroad of the defendant company crosses Cinnaminson avenue at grade; there is no other laid-out road which crosses the railroad in the village, nor at any nearer point than

one-half to three-quarters of a mile. There are places where people do cross at several points, but none of them are recognized as laid-out crossings. The testimony is that there is a population of about three thousand in the village, the bulk of which, probably two-thirds, reside on the north or river side of the railroad. A considerable part of the population, about one-third, resides on the south side of the railroad. On that side are several stores, the town hall, public school-house and other buildings. The local travel across the railroad tracks is considerable. Children going to and from school cross in great numbers.

In addition to this crossing by the local residents, is the highway travel from the surrounding country. Cinnaminson avenue is a stone road, connecting with several other roads, over which many wagons travel to and from Camden. The neighboring country is what is known as a "trucking" district, and supplies the Philadelphia market, by wagons carrying vegetables and fruits, many of which pass along Cinnaminson avenue and cross the railroad at grade. Within a few years the railroad company erected a new station-house at the northeast corner of Cinnaminson avenue and South Broad street, parallel with and adjoining its westbound tracks. This station-house is about sixty feet long, one story high, the peak of the roof being about twenty feet from the ground. The station-house proper is surrounded by a roofed platform. At the southwest corner of Cinnaminson avenue, but apparently off the railroad property, is a grove of large trees, standing some twenty or thirty feet apart, nearly up to the street line. The railroad company has a railing or fence on the south side of its tracks, on its right of way, on each side of Cinnaminson avenue and parallel to it, obviously put there to compel passers on that avenue to stay on the avenue in crossing the railroad tracks.

In the month of April an observation, taken for six days, showed an average of eleven hundred per day of wagons, bicycles and people crossing the railroad at Cinnaminson avenue between six o'clock in the morning and six at night. The testimony of the assistant trainmaster is that there is an average of sixty trains in every twenty-four hours which cross Cinnaminson avenue. Five express passenger trains, all in the daytime, scheduled

at a speed of forty miles an hour, run by Palmyra without stopping. The other passenger trains, which stop at Palmyra, run at a speed of about twenty miles per hour. The extra freight trains run at fifteen miles and the other freight trains at ten miles an hour.

An examination of the accompanying reduced copy of plan offered in evidence will show the location of the station-house and platforms and their relation to Cinnaminson avenue and Broad street.

Palmyra *v.* Pennsylvania R. R. Co.

It will be noted from the diagram that the station itself is an obstruction to the view of persons coming south along Cinnaminson avenue, when they arrive at its intersection with Broad street, in looking for trains approaching from the east, traveling on the westbound track. Several witnesses testified to the fact, and the physical conditions support their testimony. The defendant company's surveyor stated that, from this point of view, a train coming from the east, on the westbound track, could not be seen until the passer on Cinnaminson avenue had gone far enough to clear the obstruction interposed by the station and its surroundings. In describing the approach of such a train from the east (that is, a westbound train) and the station as an obstruction of the sight of it by a person passing south along Cinnaminson avenue, the same witness testified that "the train would be almost on top of you before you did see it, there is so much there."

These facts indicate the extent of the danger to the public at Cinnaminson avenue crossing. It is undisputed that there are no safeguards at that crossing, save that when express trains go by the station agent comes out and protects the crossing with a flag. For all other protection the crossers of the tracks are dependent upon the blowing of the whistle and the ringing of the bell.

The defendant company insists that it is not within the true intent and meaning of the statute of March 16th, 1898, that other safeguards than the use of the whistle and the bell should be required at any crossing,

"except in cases where there is an obligation or duty imposed to provide such additional protection by reason of the location or construction by such railroad company of its tracks, buildings or works."

I do not accept this view of the effect of that statute, but, if it be admitted to have the construction stated, the evidence of the defendant company's surveyor shows that the station which stops the view of the tracks was recently constructed by the defendant company; that the centre line of Broad street, just before it intersects Cinnaminson avenue, was changed to put the station there, and when that witness testified that a passer on

Cinnaminson avenue, at its intersection with Broad street, would have a train approaching from the east almost on top of him before he could see it, because "there is so much there," the "so much" which he referred to is the station, which the defendant company has so located that a train approaching from the east is obscured until almost on top of a passer on the highway (Cinnaminson avenue). The "station and its surroundings," which the same witness said the passer on Cinnaminson avenue would have to clear, in order to see the trains, are the defendant company's buildings, located and erected by it. Other witnesses and the lay of the ground show this to be the actual situation at that crossing.

The diagram indicates the locality where, to one passing southwardly along Cinnaminson avenue, a train coming from the east, on the westbound track, is, for a considerable distance, obscured from view. The line of arrows at the intersection of Cinnaminson avenue and Broad street marks the line of obscuration, which continues until the passer on Cinnaminson avenue is almost upon the westbound track.

It therefore appears that, because of the location by the railroad company of its own buildings, there is an increase of the danger at the crossing under consideration, and a corresponding duty is cast upon the railroad company to furnish additional safeguards to the public at that place.

The order of the company that the station agent shall flag the five express trains which do not stop at Palmyra, affords, of course, no protection against the fifty-five other trains which pass over the tracks of the defendant company at Cinnaminson crossing.

The detailed circumstances attending the situation in Palmyra, at the railroad grade crossing of Cinnaminson avenue, are certainly such that, in the words of the statute of 1898, it is reasonably necessary, for the security of human life and the protection of the public, that gates or bars should be there erected or maintained.

The railroad company, however, not only denies that the existing conditions at the locus in quo require additional precautions for the safety of the public, but, by virtue of the charter of the

Camden and Amboy Railroad Company, under which it is operating the railroad which crosses Cinnaminson avenue, it claims a right to cross highways along its route, at grade, at a high rate of speed, upon constructing passages across its railroad, "so that the passage of carriages, horses and cattle shall not be prevented thereby." See *P. L. of 1830 p. 88 § 15.*

It is insisted in argument for the defendant company that these provisions of the original railroad charter have been observed and that they give some contractual rights to the railroad company, which have been intruded upon by the statute of 1898.

If it be true that the original charter gives to the Camden and Amboy Railroad Company, and its successors, the right to construct a railway across public highways and imposes only a duty to build passages across the railway for horses and carriages, which once performed need not be changed, then not only the act of 1898 but the statutory provisions requiring blowing a whistle and ringing a bell, must also be held to be unconstitutional impairments of the original contract, for both those requirements were imposed by subsequent enactments. The ringing of the bell was required by the act of March 9th, 1839, and the blowing of the whistle by the act of March 26th, 1852. See *1 Nix. Dig. p. 680.*

The effect of this requirement to build passages across public highways has been declared by our courts. The same provision, word for word, as that contained in section 15 of the Camden and Amboy railroad charter, occurs in the charter of the Central railroad of New Jersey. *P. L. of 1847 p. 133.* This section was constructed by the supreme court in the case of *Central Railroad Co.* v. *State, 3 Vr. 224,* and the construction given entirely refutes the idea that a "once for all" construction of such railroad crossings is a compliance with the charter requirements. It was there held that the obligation to provide that horses and carriages might have safe passage across the railroad, was "a continuing duty to which the company is made subject, which in its performance must be measured by circumstances. Thus a bridge or passageway, which at one time would be adequate to the public accommodation, might at a subsequent period from an increase of business or population, be totally inadequate, and consequently

a provision which at one juncture would be a discharge of the duty, would at another almost amount to an infraction." The court also recognized the increase of the railroad's business and the consequent danger to the public, rendering the street impassable, as imposing on the railroad company an obligation to provide additional conveniences for safe crossing and summed up the definition of the company's duty by the declaration: "The duty prescribed is to keep at all times, and under all circumstances, the public highways at the point where they cross the railroad in a condition fit for safe and convenient use."

This construction of the obligation imposed by the section under consideration has never been challenged, and has been followed in this court in *Jersey City* v. *Central Railroad Co., 13 Stew. Eq. 420,* and in *Township of Raritan* v. *Port Reading Railroad Co., 4 Dick. Ch. Rep. 15.* In *Clark* v. *Elizabeth, 32 Vr. 575,* the court of errors discussed the line of cases expository of the section in question, and approved this declaration of the duties of railroad companies at highway crossings where the question presented involved the rights of the public.

It seems to be quite clear that under the section in question, the duty of the railroad company to provide safe and efficient crossings for the public passage is a continuing one, varying at each crossing as circumstances at that place may vary. Either growth of population and business in the neighborhood of a crossing or the passage of large railroad traffic over its tracks where the highway crosses it, is a circumstance which will oblige the railroad company to provide additional safeguards. The defendant company cannot, under the provisions in the Camden and Amboy Railroad Company charter requiring it to provide passage across its tracks, maintain that such crossings were arranged once for all, thus relieving that company from all further duty in that matter.

The Pennsylvania Railroad Company further contests the constitutionality of the statute of 1898, under which the order of this court is sought. It contends that in attempting to confer upon this court the power to inquire into and determine whether such danger exists at a particular railroad grade crossing of a highway, as to be detrimental to the public safety, and to direct

the railroad company to place there certain additional safeguards, if found necessary, the legislature has exceeded its authority and has imposed upon the judicial department of the government the exercise of a power that properly belongs to the legislative department, and that this statute is therefore obnoxious to article 3, section 1, of the constitution of this state.

The constitution, while requiring that the three great departments of government shall act separately, does not define, with any precision, where the limits of the functions peculiar to either begin or end. Many of these are so simple in their character as to be recognized as of course. Others are quite complex in their operation, and involve the doing of acts by one of these great departments which appear to be intrusions, to some extent at least, upon the domain of the others. It is almost impossible, in the conduct of government, to observe a precise and exact separation of these functions. This difficulty was recognized and dealt with by the court of errors and appeals, in the case of *Paul* v. *Gloucester, 21 Vr. 611.* That court there declared that the clause of the constitution under consideration operates prohibitively only when it relates to those powers which, by the constitution itself are assigned to, or which, in their nature, pertain to, one of the three great departments exclusively. The court cites numerous instances showing that, in the usual and accepted conduct of government, powers which are not expressly or inherently related to any one department have always been exercised by that one of them to which they are, by law, referred. The court declares that "the conclusion is inevitable that this multitude of duties was regarded as lying outside of what were termed the powers properly belonging to the executive, legislative and judicial departments, and was left, by the constitution, to be discharged in such mode as the law should provide.

Upon this question of the relation of the powers of government there are several decisions which, at first glance, appear to be favorable to the contention of the defendant company. The cases of *Pennsylvania Railroad Co.* v. *Matthews, 7 Vr. 531,* and *New York Railroad Co.* v. *Leaman, 25 Vr. 202 (Court of Errors),* declare that it is the function of the legislature to prescribe the character of the safeguards which railroad companies shall pro-

vide at highway crossings, and that, if additional protection is necessary, the requirement therefor "must proceed from the legislative, and not from the judicial, power." *Matthews Case, 7 Vr. 584.*

The court in these cases had under consideration the adoption, by the legislature, of general rules applicable, as a matter of general state policy, to the crossing of all highways by railroad tracks. Neither of the cases cited discusses or refers to the duty specially imposed upon the railroad company by its own charter.

Such general legislative regulations could not possibly provide for the special emergencies arising at particular crossings, calling for appliances to make each crossing safe which are peculiar to that spot. In some cases one method would fitly afford relief, in other cases another.

Remedies for these exigencies must be provided. The functions to be exercised in providing them cannot be deemed to be legislative. The legislature has no means of investigating and determining the questions which these conditions raise, or of directing the installing of the additional safeguard which each particular crossing may require, because of its own peculiarities. If it attempted to hear and determine disputes between municipalities and railroad companies as to their respective rights and duties at each particular crossing, the parties must be noticed, a hearing must be had, evidence must be produced and its admissibility ruled upon, argument must be heard and considered, and a judgment must be pronounced.

These incidents are inherently necessary to the accomplishment of the desired result—*i. e.,* the ascertainment whether, at a particular crossing, it is the duty of a particular railroad company to provide additional safeguards, because of the situation of affairs there existing. Such a procedure by the legislative department, in any mode of its action, would certainly go much further to intrude upon powers properly belonging to the judicial department than the exercise of the powers conferred by the statute of March 16th, 1898, upon this court, would be an intrusion upon the legislative field.

There is also some difficulty in following the line of cases

beginning with the *Matthews Case,* when the matter in hand does not precisely fit the precedent.  Those cases declare that the defining of the safeguards which shall give notice of the approach of trains to highway crossings is a matter of legislative, and not of judicial, power.  It will, however, be found, upon examination, that those judgments themselves, by judicial decision alone, and without any legislative action whatever, not only declare that the ringing of the bell and the blowing of the whistle are the limits of the railroad company's obligation at railroad crossings, in the matter of providing safeguards, but they also, by judicial determination, without any statutory enactment, declare that, in case the railroad company increases the danger at a crossing, it thus becomes bound to provide extra safeguards.

Neither the statute of 1839, which originally required the ringing of the bell, nor that of 1852, which required both the bell and the whistle, declared that the doing of these acts freed the railroad companies from all further obligation to provide safe passage at highway crossings, nor has any other statute declared such a freedom.  The declaration that it exists is purely judicial, appearing, for the first time, so far as I have been able to discover, in 1873, by the decision in the *Matthews Case.*  The exception to this rule of freedom from liability, on ringing the bell and blowing the whistle, by which, "when the railroad company has created extra danger, it is bound to use extra precautions," is not declared in any statute.  It is purely judicial in its origin, and had its beginning in the same *Matthews Case,* as may be plainly seen on reading that decision.  In that case a verdict was sustained on the express ground that this judicially ascertained and declared railroad obligation to furnish additional safeguards (the company having created extra danger) had not been performed.

The *Matthews Case* itself (which was followed in the *Leaman Case*) thus appears to have defined the limits of railroad responsibility at railroad crossings, and to have declared a contingency in which additional safeguards at crossings must be provided by railroad companies.  All this by judicial decision only, and without any legislative action whatever.  If the judicial department may thus ascertain and fix the duties of railroad companies as to safeguards at crossings, and declare contingencies in which the

companies shall furnish additional safeguards, it is very difficult to discover the line where the judicial capacity ceases and legislative authority takes exclusive possession of the field.

The decisions in the *Matthews* and *Leaman Cases* (if they are held applicable to this suit by a municipality to secure a safer railroad crossing) conflict with the above-cited line of cases, following *State* v. *Central Railroad Co.,* which declares that the duty of that railroad company, under the express provisions of its charter to provide safe passages, is continuous, varying according to the amount of traffic and travel at each particular crossing. The duty of the defendant company in this suit must be the same. See *P. L. of 1830 p. 88 § 15.* These decisions also recognize, as a factor which imposes an obligation on the railroad company to furnish additional safeguards, the increase of population and business in the locality, whereby a bridge or passageway already provided by the railroad company may have become inadequate. These incidents, surrounding population and large travel over the highway crossing the railroad, are, by the *Matthews Case,* excluded from consideration as operating to charge the railroad company to provide added safeguards. According to that case, the additional duty can only be created by the misconduct of the railroad itself. Increase of population and of business on the highway at a crossing are not chargeable as misconduct of a railroad company.

The court of errors and appeals, in *Clark* v. *Elizabeth, 32 Vr. 575,* in discussing the construction of the charter provision regarding crossings in *State* v. *Central Railroad Co.* and other like decisions, recognized, as is above mentioned, a distinction between actions where the interests of the general public at crossings were involved and those which asserted the rights of an individual whose property was injured. Both the *Matthews* and the *Leaman Cases,* declaring the doctrine of freedom from liability on giving the statutory signals (unless the railroad company has increased the danger), were actions by individuals for damage for injuries to property.

The case now in hand is an effort by the municipality to compel the railroad company to provide at a particular crossing, for the benefit of the public in general, safeguards in addition to the

whistle and the bell.  If the distinction recognized by the court of errors in *Clark* v. *Elizabeth, supra* (which arose on a claim by an individual for injuries to his lands), is applicable to this case, it would remove it from the operation of the rules laid down in the *Matthews* and *Leaman Cases,* which were suits by individuals for damages for injuries to personal property.

It is not, however, necessary for the decision of this cause, that these apparently conflicting declarations should be reconciled.  All the cases which discuss the relations of railroad companies to highway crossings from any point of view agree that where the conduct of the company has increased the danger at any particular highway crossing, this of itself charges the company with a duty to provide additional safeguards at that crossing which shall afford protection commensurate with the increased danger.

The counsel for the defendant company frankly concede this to be the law of this state.

The evidence taken in this matter, above reviewed, proves that at the Cinnaminson avenue crossing there has been, by the acts of the railroad company itself, an increase of danger to those who use that highway.  This condition imposes upon the railroad company an obligation to provide additional safeguards to protect the public traveling that highway.  The function of this court, under the act of 1898, is not to create this duty by its decree, as is contended by defendant's counsel.  What this court does is to inquire whether it exists, and if it so finds to enforce it, just as it might specifically enforce any other obligation where that is the appropriate relief.  Upon the theory of all the decisions this duty has existed ever since the railroad company brought the unfavorable conditions at the crossing into being.  This court, in proceedings under this statute, exercises no legislative function in the matter, all its action is purely judicial.

The defendant further contends that if the statute of 1898 is not an interference with legislative functions, it is still unconstitutional in that it seeks to confer upon this court a power which inherently belongs to the supreme court, exercisable by the writ of *mandamus.*

In the statute under consideration the procedure contemplated by this court is an inquiry whether the duty to provide an additional safeguard at that crossing exists, and if it be found that it does, to adjudge which remedy is applicable most effectually to fulfill it. The statute affords the railroad company an opportunity to contest, as a disputable fact on the hearing in this court, the existence of the duty to provide additional safeguards at the particular crossing in question, and requires this court to decide which particular safeguard is most efficient to relieve against danger at that crossing. While this proceeding is in many respects analogous to the specific enforcement of contracts (a familiar field of equity jurisdiction), wherein the existence of the obligation is triable and its enforcement in the most efficient manner is within the scope of the decree, it is repugnant to the characteristics of a *mandamus* proceeding in the law courts, for in the latter procedure the applicant must show in the first instance a pre-existing clear legal right to have the thing which he asks done in the manner sought to be enforced. *High Extr. Rem. 13 § 9,* and cases there cited. No *mandamus* would be allowed to try the question of the existence of the duty sought to be enforced by that writ, nor would that mode of procedure enable a decision to be made, determining as this statute contemplates, which of several safeguards will most perfectly protect the crossing. The statute cannot be held to be unconstitutional because it intrudes upon the inherent constitutional powers of the supreme court.

That the jurisdiction of this court may rightfully be invoked by a municipality to protect the highways from a railroad company's wrongful exercise of its admitted rights at a crossing was unanimously held by the court of appeals in the case of *Easton and Amboy Railroad Co.* v. *Greenwich, 10 C. E. Gr. 565.*

There is another ground of equity jurisdiction under which the powers, conferred upon this court by the statute of 1898, may be well exercised. This is the regulation of the enjoyment by two or more persons of several easements in common property. This was luminously expounded by the late Chief-Justice Beasley, sitting in this court for the chancellor, in *Delaware, Lackawanna and Western Railroad Co.* v. *Erie Railroad Co., 6 C. E.*

*Gr. 304.* He there says: "In the case before me the parties possess a community of interest in their property. They are tenants in common of an easement, and if this court cannot protect the one against the injustice of the other, the party whose rights are invaded is clearly without any adequate remedy. The general cognizance of equity in cases of this kind, where property is enjoyed in common, will not, it is presumed, be disputed by anyone." This exposition of the jurisdiction of this court was approved by the court of appeals, and it was there declared that it might be invoked in cases where conflicts arise between railroad companies in the use of a crossing. *National Docks Railroad Co.* v. *Central Railroad Co., 5 Stew. Eq. 767.* The same ruling was approved by the court of appeals in *National Docks Railroad Co.* v. *United New Jersey Railroad Co., 24 Vr. 224.* The principle is the same where a dispute arises between a railroad company and a municipality as to their respective use of a highway crossing the railway.

Municipal authorities being charged with the duty of keeping the highways fit for safe and convenient passage, this court has always maintained their right to its aid to restrain wrongful acts by railroad companies at crossings (*City of Newark* v. *Delaware, Lackawanna and Western Railroad Co., 15 Stew. Eq. 196*), or longitudinally (*City of Burlington* v. *Pennsylvania Railroad Co., 11 Dick. Ch. Rep. 260*). The same principle was unanimously declared by the court of appeals in *Township of Greenwich* v. *Easton and Amboy Railroad Co., ubi supra.*

The jurisdiction conferred by the statute of 1898 upon this court accords with its modes of procedure and is consistent with its general equity powers. On this application that statute may be given its more limited effect, authorizing an inquiry to ascertain whether at Cinnaminson avenue the defendant company has so dealt with the highway that it has increased the danger at the crossing, thereby incurring a duty to provide additional safeguards. This court takes cognizance of the present matter to ascertain whether such a duty is owing by the defendant company, because of its own conduct, and to determine which of the safeguards named in the statute should be provided.

Upon the case presented there is a sufficient showing that

there is such a condition of danger at Cinnaminson avenue crossing named in the petition, occasioned by the acts of the defendant company; that it is reasonable and necessary for the security of human life and for the protection of the public that additional protection should be there provided.

In view of the evidence that a large number of pedestrians and also horses and carriages go over that crossing, the most effective mode of protecting life and property there appears to be the adjustable bars referred to in the testimony, which not only serve as a warning to pedestrians but also as a check to passing teams of horses and carriages. They may be raised and lowered as occasion may require, and appear to afford the most protection to, with the least obstruction of, the highway.

The evidence shows that the occasion for this additional safeguard is the act of the defendant company in so locating its station that it obscures, from one point of view, the sight of approaching trains. Under such circumstances the expense of establishing and maintaining the additional protection required should be borne by the defendant company.

I will advise an order according to the views above expressed.