NEW JERSEY HIGHWAY AUTHORITY, PLAINTIFF-RE-
SPONDENT, v. THE CENTRAL RAILROAD COMPANY
OF NEW JERSEY, A NEW JERSEY CORPORATION;
THE HANOVER BANK, TRUSTEE, A FOREIGN CORPO-
RATION, DEFENDANTS-APPELLANTS.

Argued November 28, 1955—Reargued February 20, 27, 1956—
Decided March 12, 1956.

158 

Mr. *Richard J. Lally* of the New York Bar argued the cause for the appellants (*Mr. Earle J. Harrington,* attorney).

Mr. *Morris M. Schnitzer* argued the cause for the respondent.

The opinion of the court was delivered by

JACOBS, J. The defendants appealed to the Appellate Division from a judgment of the Law Division which declared that the plaintiff had the right to construct the Garden State Parkway under the tracks and facilities and across the right-of-way of the defendant The Central Railroad Company of New Jersey without compensation for use of or entry upon such right of way. We certified under *R. R.* 1:10–1.

The Central Railroad was originally incorporated, under the name of Somerville and Easton Railroad Company, by *L.* 1847, *p.* 128 which provided in section 9 as follows:

> "*And be it enacted*, That it shall be the duty of the said company to construct and keep in repair good and sufficient bridges or passages over or under the said railroad or roads, where any public or other road shall cross the same, so that the passage of carriages, horses, and cattle on the said road shall not be impeded thereby; and also, where the said road shall intersect any farm or lands of any individual, to provide and keep in repair suitable wagon ways over or under the said road, so that he may pass the same."

The general Railway Act of 1873 (*L.* 1873, *c.* 413, *p.* 88) provided in section 14 that it shall be the duty of any company incorporated thereunder to construct and maintain sufficient bridges and passages over, under and across the railroad "where any public or other road now or hereafter laid, shall cross the same." In an 1882 supplement the Legislature extended the duty to all companies operating railroads within the State. *L.* 1882, *c.* 157, *p.* 245. And in a later act concerning railroads (Revision of 1903) (*L.* 1903, *c.* 257, *p.* 645) the Legislature in section 26 again imposed the duty with respect to all railroads in the State with the proviso, however, that the "section shall not enlarge the duty imposed by its charter upon any railroad company incorporated by special act and whose railroad was constructed before the second day of April, eighteen hundred and seventy-three." The requirements of section 26 are now found in *R. S.* 48:12–49.

In 1952 the Legislature passed the act which created the New Jersey Highway Authority and empowered it to con-

struct the Garden State Parkway. *L.* 1952, *c.* 16; *Town of
Bloomfield v. N. J. Highway Authority,* 18 *N. J.* 237, 243
(1955). Section 6 of that act (*N. J. S. A.* 27:12B–6)
authorized the Authority to relocate public utility facilities
at its own expense. The route of the Parkway intersected
the Central Railroad's right-of-way at a point in Matawan
Township, Monmouth County, and the Authority's plan was
to carry the Parkway under the railroad which had facilities
consisting "of a single main track together with signal and
wire facilities, and, in addition, a portion of a double end
siding which was used for passing purposes, all located at
grade." In due course, the Authority accomplished a crossing
of its three-lane Parkway under the railroad by constructing,
at the Authority's expense, a viaduct to carry the existing
single main line track, wire and signal facilities of the rail-
road, eliminating the double end siding, and leaving no
room for the construction of any additional main line track
on the viaduct. On September 22, 1953 the Authority filed
its verified complaint in the Law Division, seeking the
acquisition of an easement on land described therein and
approximating 3.42 acres; the Authority prayed for (1) an
adjudication that it had the right to construct and maintain
the Parkway under the tracks and facilities and across the
right of way of the Central Railroad without compensation
"for use of or entry upon such right of way," and (2) in the
alternative, that condemnation commissioners be appointed
under *R. S.* 20:1–1 *et seq.* A stipulation was entered into
by the parties stating the facts hereinbefore set forth and
asserting that in the course of the Parkway construction
the Authority had made "substantial excavations from the
lands which are the subject matter of this action and portions
of such land are now occupied by Parkway road bed and fills
and slopes needed for the Parkway as well as the viaduct."
The parties also agreed that "of the land which is the subject
matter of the action no more than an area of Fifty-three (53)
feet wide, including the present viaduct is owned or controlled
by the defendant railroad as a right of way for its railroad"
and that "the remainder of the said lands are not and were

not used for railroad purposes or needed therefor and any use thereof by the plaintiff is compensable by agreement or condemnation."

Upon the filing of the verified complaint the Law Division issued an order to show cause and a general appearance was entered by the defendants. The single issue presented to Judge Lloyd in the Law Division turned on the question of whether section 9 of the 1847 act incorporating the railroad imposed a duty upon it with respect to future as well as pre-existing public highways. Judge Lloyd expressly found that it did and on April 15, 1955 he entered a judgment which declared that the Authority had the right to construct its Parkway across the railroad's right of way (comprising a strip no more than 53 feet wide) without compensation "for use of or entry upon such right of way"; the judgment provided that "the action shall proceed as a conventional condemnation with respect to the remainder of the property described in the complaint." After the defendants filed their notice of appeal from the judgment the parties entered into a stipulation dated September 14, 1955 that the section of the railroad which is referred to in the complaint "was constructed after April 2, 1873." The Authority has moved to enlarge the record on appeal by the inclusion of this stipulation and we see no reason why its motion should not now be granted. See *Const.* 1947, *Art.* VI, § V, *par.* 3; *R. R.* 1:5–4. *Cf. Devlin v. Surgent*, 18 *N. J.* 148 (1955); *Kelley v. Curtiss*, 16 *N. J.* 265 (1954).

The railroad now contends, as it did below, that section 9 of its charter relates "only to roads which were in existence when the railroad was built" and it relies primarily on *Morris Canal & Banking Co. v. State*, 24 *N. J. L.* 62 (*Sup. Ct.* 1853); *Morris & Essex R. R. Co. v. Orange*, 63 *N. J. L.* 252 (*E. & A.* 1899); and *West Jersey & Seashore R. R. Co. v. Woodbury*, 80 *N. J. Eq.* 412 (*Ch.* 1912). On the other hand, the Authority asserts that the broad language and purposes of section 9 make it clearly applicable to future as well as existing highways and it relies primarily on the views expressed by Chief Justice Beasley in *State v. Central*

*R. R. Co.*, 32 *N. J. L.* 220 (*Sup. Ct.* 1867), by Justice Dixon in *Morris & Essex R. R. Co. v. Orange, supra,* 63 *N. J. L.*, at 274, and by Justice Swayze in *State v. Lehigh Valley R. R. Co.*, 89 *N. J. L.* 48 (*Sup. Ct.* 1916), affirmed 90 *N. J. L.* 340 (*E. & A.* 1917). In the *Morris Canal* case, *supra,* the charter provided that "when the canal shall cross any public road or farm" it shall be the duty of the company to construct and maintain sufficient bridges; the court in holding that this referred only to pre-existing roads was careful to point out that its determination had reference to the particular charter in question and that provisions in other charters are "couched in different language, which will admit of, and perhaps may require, a different construction." In the *Morris & Essex R. R. Co.* case, *supra,* the majority opinion seemingly accepted the position (not there disputed by the parties) that the railroad was at least entitled to nominal damages on the laying of a new highway over its tracks. The majority did not discuss the railroad's charter provision (similar to section 9 in the instant matter) but it was quoted by Justice Dixon in his concurring opinion; Justice Dixon unequivocally expressed the view that it referred to "highways laid across the railroad at any time." In the *West Jersey & Seashore R. R. Co.* case, *supra,* Vice-Chancellor Leaming considered the *Morris & Essex R. R.* case, *supra,* as a holding that the charter provision applied only to pre-existing roads.

In the *Central R. R. Co.* case, *supra,* the railroad altered an intersecting highway and relied upon section 9 of its charter as furnishing authority for its action. In discussing that section Chief Justice Beasley noted that (1) it imposed a duty on the company in favor of the public, (2) it was to be taken "most strongly against the corporation" although it was to receive a reasonable construction, and (3) it imposed a "continuing duty" which, in its performance, "must be measured by circumstances." See *Inhabitants of Palmyra v. Pennsylvania R. R. Co.*, 62 *N. J. Eq.* 601, 609 (*Ch.* 1901), affirmed 63 *N. J. Eq.* 799 (*E. & A.* 1902); *Borough of Metuchen v. Pennsylvania R. R. Co.*, 73 *N. J. Eq.* 359, 364 (*E. & A.* 1908). In his concurring opinion in the *Morris &*

*Essex R. R. Co.* case, *supra,* Justice Dixon remarked that by accepting its charter the company became "subject to the opening of highways across its railroad, and to the duty of making and keeping in repair safe crossings therefor, without receiving from the public any compensation other than the grants contained in the charter." See 63 *N. J. L.,* at *page* 274. In the *Lehigh Valley R. R. Co.* case, *supra,* Justice Swayze indicated his agreement with the views expressed by Justice Dixon; he pointed out that the *Morris Canal Co.* case, *supra,* turned upon "the peculiar language of the charter" and he reaffirmed the rule of *State v. Central R. R. Co., supra,* that "the company is subject to a continuing duty measured by circumstances." He flatly rejected the railroad's contention "that the operation of motor vehicles and the improvement of the highway by macadamizing" it had so changed the nature and use of the highway as to terminate the company's charter obligation.

██ While the foregoing authorities are in no sense dispositive, we are satisfied that Justice Dixon's construction of the charter language was sound and should be accepted in the instant matter. Section 9 provides that the railroad shall construct and maintain bridges or passages over or under the railroad where any public road "shall cross the same"; this terminology clearly includes public roads which in the future cross the railroad. It is to be contrasted with the last portion of the section which deals with instances where the railroad "shall intersect any farm or lands of any individual" and refers to the situation as it existed when the railroad was constructed. The difference in purpose as well as in language seems fairly evident. When concerned with private landowners the Legislature equitably afforded suitable protection in all cases where the construction of the railroad divided their land with resulting inconvenience; it had no reason to provide protection for landowners who later acquired property on both sides of the railroad. On the other hand, the public was properly entitled to protection not only with regard to the situation as it then existed but also with regard to future circumstances. The Legislature had granted valu-

able rights to the railroad over public ways and it may be taken to have reciprocally imposed the duty on the railroad to maintain proper crossings over public ways whenever established. Any notion that the Legislature's interest was confined to the situation as it existed when the railroad was constructed would suggest that it lacked vision and understanding as to its important responsibilities for the future as well as the present. It seems to us that it may justly be assumed that, by its comprehensive language, the Legislature intended to impose a continuing duty sufficient to meet the public needs as they then existed and as they would arise from time to time thereafter. This construction is buttressed by the established doctrine that even where such statutory language is doubtful it is to be construed liberally in favor of the public. See *State v. Central R. R. Co., supra. Cf. State ex rel. City of Minneapolis v. St. Paul M. & M. Ry. Co.*, 98 *Minn.* 380, 108 *N. W.* 261, 266, 28 *L. R. A., N. S.*, 298 (1906), affirmed 214 *U. S.* 497, 29 *S. Ct.* 698, 53 *L. Ed.* 1060 (1909), where the court, in construing a charter provision as applicable to future as well as existing roads, said:

"While the statute on its face might be construed as intended to apply to existing highways only, a fair and reasonable construction thereof, in view of the legislative policy of the state on this subject, and the propriety and necessity for some specific regulation, will bring within its scope and purpose streets and highways subsequently laid out and opened. It is elementary that charters of public corporations, in which the rights of the public are involved, are to be construed with strictness against the corporation, and liberally in favor of the public. *St. Louis River* [*Dallas*] *Imp. Co. v. C. N. Nelson Lumber Co.*, 51 *Minn.* 10, 52 *N. W.* 976; *Commonwealth v.* [*Erie & N. E.*] *Railway Co.*, 27 *Pa.* 339, 67 *Am. Dec.* 471. Or, as said by the New York Court of Appeals, in *Tracy v.* [*Troy & B. B.*] *Railway Co.*, 38 *N. Y.* 433, 98 *Am. Dec.* 54, an act of the Legislature, induced by public considerations, the purpose of which is to protect the·traveling public, should receive a liberal construction to effectuate the purpose of its framers. 'A rigid and literal reading would in many cases defeat the very object of the statute and exemplify the maxim that "the letter killeth, while the spirit keepeth alive."' The operation of statutes is often extended, by construction, to matters of subsequent creation and applied to conditions that accrue after their passage, as well as to those that existed before."

See *State ex rel. City of Duluth v. Northern Pac. Ry. Co.,*
98 *Minn.* 429, 108 *N. W.* 269 (1906), affirmed 208 *U. S.* 583,
28 *S. Ct.* 341, 52 *L. Ed.* 630 (1908).

The stipulation dated September 25, 1955 discloses
that the section of the railroad described in the complaint was
constructed after April 2, 1873 and that consequently *R. S.*
48:12–49 is applicable. That statute simply describes in
more modern and explicit language the railroad's compre-
hensive duty with respect to future as well as existing high-
ways. There is no reason to doubt the validity of the statute
as a constitutional exercise of the State's police power. See
*Chicago M. & St. P. R. Co. v. Minneapolis,* 232 *U. S.* 430,
34 *S. Ct.* 400, 58 *L. Ed.* 671 (1914) ; *Atchison, Topeka &
S. F. R. Co. v. Public Utilities Comm.,* 346 *U. S.* 346, 74
*S. Ct.* 92, 98 *L. Ed.* 51 (1953) ; *Erie R. R. Co. v. Public
Utility Com'rs,* 89 *N. J. L.* 57 (*Sup. Ct.* 1916), affirmed 90
*N. J. L.* 672 (*E. & A.* 1917), affirmed 254 *U. S.* 394, 41
*S. Ct.* 169, 65 *L. Ed.* 322 (1921) ; Heher, J., dissenting in
*Central R. R. Co. of N. J. v. Board of Public Utility Com'rs,*
112 *N. J. L.* 215, 559 (*Sup. Ct.* 1934), affirmed *Central R.
Co. v. State Highway Comm.,* 114 *N. J. L.* 397 (*E. & A.*
1935). In the *Erie R. R. Co.* case, *supra* (89 *N. J. L.,* at
84) Justice Garrison quoted with full approval the United
States Supreme Court's statement in *Chicago M. & St. P. R.
Co. v. Minneapolis, supra,* that "railroad corporations may
be required, at their own expense, not only to abolish existing
grade crossings, but also to build and maintain suitable
bridges or viaducts to carry highways, newly laid out, over
their tracks, or to carry their tracks over such highways."
[232 *U. S.* 430, 34 *S. Ct.* 401] Similarly in his opinion in
*Central R. R. Co. of N. J. v. Board of Public Utility Com'rs,
supra,* Justice Heher rightly pointed out that the Legislature
had ample power to require, for the convenience and safety
of the public, that railroads operating within the State pro-
vide suitable crossings for new as well as old highways. In
the course of his opinion he noted that every railroad receives
its charter subject to the right of the State to open highways
across its right of way "as public convenience and necessity

may, from time to time, require" and that, in such event, the railroad may reasonably be subjected by the State to the obligation of maintaining suitable crossings at the railroad's expense.

When the Legislature created the Highway Authority and authorized the construction of the Garden State Parkway it might well have imposed the full obligation of providing suitable crossings upon railroad companies such as the Central Railroad; in view of the nature of the Parkway this would have entailed heavy expenditures by them for suitable bridges or viaducts. Instead, the Legislature imposed a much lesser burden upon them; it provided in *N. J. S. A.* 27:12B-6 that the Authority would have power to make reasonable regulations for the removal and relocation of public utility facilities such as the railroad tracks, signal and wire facilities, and double end siding in the instant matter; and it provided further that "the cost and expenses of such relocation or removal, including the cost of installing such facilities in a new location," shall be borne by the Authority and that the utility shall have the same right to maintain and operate its facilities at the new location as it had at the old. The viaduct in the instant matter was constructed by the Authority at its own expense, and we were advised at the argument that the obligation of maintaining it rests with the Authority under an agreement between it and the Central Railroad. The railroad's single main track now crosses the viaduct and serves as effectively as originally. The double end siding has not yet been relocated but the Authority does not deny its statutory obligation and as it points out in its brief "such rights as the railroad may have to relocation of the siding at the Authority's expense (*N. J. S. A.* 27:12B-6) were not touched or precluded by the judgment." Similarly the judgment below does not affect the railroad's claim for compensation for the taking of land or otherwise except to the limited extent that it declares that the Authority had the right to construct and maintain the Parkway under the railroad's facilities and across its right-of-way comprising a strip of 53 feet, without compensation "for use of or entry upon such right of way." We believe that, under the circumstances

presented, this declaration lawfully carries forth the legis-
lative contemplation as expressed in section 9 of the company's
charter, in *R. S.* 48:12–49, and in *N. J. S. A.* 27:12B–6.

██ The Central Railroad's primary complaint seems to
be that the viaduct built by the Authority affords no room
for any additional main track. During reargument, counsel
for the railroad acknowledged that it had been operating with
a single main track since 1879; that nothing had yet occurred
which indicated the need for a second track; and that the
suggested need was in any event speculative. He contended
nevertheless that by the enactment of *N. J. S. A.* 27:12B–6
the Legislature contemplated that the Authority would be
legally obligated to pay damages for the loss of the railroad's
formerly held opportunity to build a second track at grade
and at moderate cost. We find nothing either in the express
terms or in the implicit purposes of *N. J. S. A.* 27:12B–6
which in anywise evidences such legislative contemplation;
nor do we find anything pertinent in *National Docks, etc.,
Co. v. Pennsylvania R. R. Co.*, 57 *N. J. L.* 637 (*E. & A.*
1895), where the court dealt not with the State's right to
effect a highway crossing through a railroad's right of way
but with a condemnation proceeding involving a crossing by
one railroad through the right of way of another railroad.
In undertaking the relocation of the railroad's existing facil-
ities without provision for the speculative contingency that
the railroad might in the future wish to lay an additional
main track, the Authority in the instant matter acted reason-
ably and wholly within the terms of *N. J. S. A.* 27:12B–6;
if the railroad should later decide to increase its facilities it
will justly be required to do so at its own expense under
the conditions then prevailing. In the light of the railroad's
voluntary undertaking by acceptance of its charter and the
requirements of *R. S.* 48:12–49 we find no substance what-
ever to the appellants' contention that the judgment below
violated the Fourteenth Amendment of the Constitution of
the United States and Article I, paragraph 20 of the Consti-
tution of New Jersey. And although the procedure in the
Law Division was summary, the appellants were not preju-

diced by it; the facts have been stipulated by the parties and the declaration in the judgment below has been found to be in accordance with the pertinent statutory and constitutional requirements.

Affirmed.

OLIPHANT, J. (concurring). I am in accord with the reasoning in the majority opinion as to the duty imposed on the appellant-railroad by the provisions of its charter and the relevant sections of the Railroad Statute, in particular *R. S.* 48:12–49; and further I am in accord with the conclusion that the costs and expenses of installing the facilities of the railroad in a new location should be borne by the Authority in accordance with the provisions of *N. J. S. A.* 27:12B–6.

The underlying dispute here is that the re-location as finally accomplished by the Authority, under *N. J. S. A.* 27:12B–6, does not provide room for any additional main track of the railroad. The section just cited states:

"In case of any such relocation or removal of facilities, as aforesaid, the public utility owning or operating the same, its successors or assigns, may maintain and operate such facilities, with the necessary appurtenances, in the new location or new locations, for as long a period, and upon the same terms and conditions, as it had the right to maintain and operate such facilities in their former location or locations."

This being so I cannot agree with the conclusion of the majority that if the railroad should later decide to increase its facilities "it will properly be required to do so at its own expense under the conditions then prevailing." This conclusion forecloses an important question which cannot be decided on the record here presented. The railroad may or may not be entitled to compensation for this apparent present loss of its right to increase the size of its main line. I think the situation on a proper showing by the railroad would be controlled by the decision in *National Docks, etc. v. Pennsylvania R. R. Co.*, 57 *N. J. L.* 637, 641 (*E. & A.* 1895). It was held in that case that where a crossing through a right-of-way of a railroad is sought by a condemnor, future demands upon

that right-of-way, which are fairly and reasonably certain are to be regarded by the tribunal which determines the just compensation to be awarded in reaching its conclusions as to the damages in the taking. The Court of Errors and Appeals in that case held that proof should have been admitted and the question submitted to the jury whether the use of the defendants' right-of-way, in the manner insisted upon, was fairly and with reasonable certainty to be anticipated and then to instruct the jury that if its answer to that question be in the affirmative the measure of damages was the cost to the defending-railroad of the construction of the additional abutments that would be necessary to accommodate more tracks on their main line.

The reasons underlying the conclusion in that case are that a right-of-way is a limited quantity of land which the Legislature has determined might reasonably be appropriated under the State's sovereign power of eminent domain to answer the ordinary, increasing and emergent uses of the railway in a continued, convenient and safe accommodation of the public. Further, that the railroad acquired it and held it, not only for the present but for future use, in the public service, with which its very being, under the law, is impressed and therefore they had the right to show and the jury determine from the evidence whether the necessity for the suggested additional trackage was fairly and reasonably to be anticipated.

It is conceded in this case, and the majority opinion so concedes, that under the re-location of the railroad facilities as accomplished by the Authority it will be impossible for the railroad under existing conditions to increase its main line to two tracks without building an additional bridge or abutment which under their charter and the statutes above referred to they are required to do.

I think the railroad in a proper proceeding within the principles of the *National Docks, etc. v. Pennsylvania R. R. Co.* case, *supra,* was entitled to establish its rights to compensation if it can, and that it should not be foreclosed at this time by the decision of this court.

OLIPHANT, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.